Thank you Mr. Sobel. Our next case is the same heading, but this time we're talking to Mr. Burghoff, Mr. Lee, and Mr. Reiser. Mr. Burghoff The District Court's denial of Aventis' motion for preliminary injunction in this case was based on an erroneous construction of the only claim that was at issue with the preliminary injunction motion, Claim 7. And according to this Court's law, that should be enough, even though we are in the context of a tentative claim construction to send the case back to the District Court because the claim construction is at odds with the intrinsic record. And we have cited the Jack Gutman case for that proposition. As recognized by the District Court, the term to be construed was substantially pure regioisomer, all three words together. And in Claim 7, the substantially pure regioisomer is the starting material that's used to make the end product referred to as a piperidine derivative compound. Hexotenadine is a particular piperidine derivative compound at issue here. And the intermediate is described, the CPK intermediate is described in the claim as being a substantially pure regioisomer. Why should we begin our claim construction with the assumption that substantially pure means different things with respect to the intermediate and the end product? Well, I don't think you even need to address the issue because it is not used in different ways in the claims in this patent at issue. There's only one use of the word substantially pure in Claim 7, or indeed in any of the claims in the patent ensue, and that is to describe the substantially pure regioisomer, the intermediate starting material, the PCPK. It is pointedly never used to describe the purity of the end product. In the claim language? In the claim language. And in the specification, the term substantially pure regioisomer is only used in describing the invention of the applicant as attaining, attaching to the intermediate. When the patent specification talks about the end products as related to the invention, it pointedly refers to them as piperidine derivative compounds, and sometimes refers to them as being substantially pure, sometimes not. But the important thing that I think distinguishes this case from Finn Control and some of the other cases of this court that have been cited, that you have to construe words in the claims of a given patent the same, does not apply here. Because the words we're worried about, substantially pure regioisomer, only occur with respect to the intermediate. But in the spec, it does refer in the specification to substantially pure end product, whatever. And would you construe substantially pure end product in the spec of this patent as referring to something other than greater than 95%? With all due respect, I'm not sure we construe words in the specification, but does it have the same meaning? What does it mean? The meaning would be that the end product is substantially pure, and it may have the same meaning, or not. Now I'm not talking about the same as the intermediate. I'm just saying when it refers to substantially pure end product in the specification, is there any dispute that they're talking about over 95%? Yes, I believe there is dispute on that, yes. So you say one skilled in the art would construe that as being, could construe substantially pure end product in the spec of this patent as being less than 95% or less? That is in dispute, Your Honor. There is an argument in a different patent that actually claims the substantially pure end product, the 610 patent, that the particular prosecution history in that patent may have limited the scope of those claims under this court's law because it was an explicit disavowal or disclaimer of claims. So let's assume hypothetically that we accept that, and so we would construe substantially pure in the spec, not a claim construction, just what the spec is talking about. Substantially pure end product based on that prosecution history to be greater than 95%. If we accept that hypothetically, wouldn't there be an assumption at least when construing substantially pure in the claim that that too means over 95%? And if not, why not? It may be a starting point, Your Honor, but that's all. Because the term to be construed is substantially pure regioisomer, the chemical intermediate. And one of ordinary skilled in the art would understand that the purity that needs to attach to an intermediate, something that's going to be made into something else, need not be as pure as a pharmaceutical grade product that's going to be administered to a patient. The important distinction in our case, Your Honor, is that Claim 7 never requires the end product to be substantially pure or any particular level of purity. All you need to do to practice that claim is to make some hexatonic of whatever purity. And that claim could have been limited to use the same words, substantially pure, to define the end product. And it wasn't. The applicant could have done that. The examiner could have done that. But it is very clear that the only use of the term substantially pure in the claim is to define the purity level of the regioisomer intermediate. But when we're talking about purity, that word itself talks in terms of something being 100%. Substantially is going to back off that at most a little bit, right? It's backing off 100% a little bit. And that's the question, Your Honor. Well, I understand that's the question, but now I'm just sticking right with the claim language, and we're not even going to tinker around with the specification. I'm saying pure is 100%. Now, you're going to back me off to 67% with the use of a weasel word? No, no. Our belief is that one of ordinary skill in the art would read substantially pure regioisomer and understand it in its normal, ordinary, and customary meaning. Substantially is a word that this court has endorsed in a number of its cases. Clearly we have, but when you put it in the context of purity, you're telling me that one of skill in the art, what in the record would suggest to me that one of skill in the art would back that off by a third? We don't. It's not our position that it would be backed off by a third. There is evidence that people of ordinary skill in the art, chemists, would understand substantially pure regioisomer to mean largely, but not wholly, pure. It still doesn't answer the question of a hard numerical limit. One of ordinary skill in the art would not put a hard numerical limit on those words. How far do you have to back it off in order to be able to allege that the accused product is infringing? Well, in this case, your honor, the evidence is that Ranbaxy's intermediate is either 88% or 92% pure. And they use that intermediate to make pharmaceutical grade hexafenamide. So it's our position that it's clear that what they're doing is largely, but not wholly, substantially pure because they get to the preferred embodiment described in the patent. They use that intermediate to make the very preferred embodiment, the pure end product of the patent, even though that's not required by the claim of issue in this case. So we believe our definition of largely, but not wholly, pure is exactly what one of ordinary skill in the art would come to the conclusion that this is what it means, and they would not put a hard numerical limit. Largely would be anything over 51%? Well, it clearly has to, your honor, refer to 67. Purity is purity. That's 100%. I'm still troubled a little bit with you backing me off. Isn't 10% already getting impure? It may in a given context. It may not in another. Okay, what is your best record evidence that one of skill in the art would say even 90% is still pure? Our best record evidence would be from Professor Jack Baldwin at the organic chemistry department at Oxford, a world-renowned chemist, organic chemist. And his view is that this term would mean largely, but not wholly. Not putting a hard numerical limit on it. Had the examiner or the applicant wished to put a hard numerical limit on the purity of the regio-isomer? Largely, but not wholly, almost be indefinite? Assume that I'm presented with a patent that says the intermediate is largely, but not wholly, pure. How do I know when I'm in trouble if I want to design around your product? If that were the case, then the use of the term substantially, which by its nature means you don't have a hard, precise limit. The presiding judge was suggesting that you do. If you say substantially pure, that means pure means pure as the driven snow, not dirty snow. You didn't claim largely. You claimed pure. No, we claimed substantially pure. And that makes it abundantly clear. But to make Judge Clevenger's point, you could have claimed largely, but not wholly. We could have. And then we would still get to the, well, yes we would, because they'd be saying, they'd be crying, that because it's purity, it has to be as pure as it is. They might be saying your claim was indefinite, and then you would be explaining why it's not. Yes. At this point of the case, Your Honor, we believe that the claim construction of the district court, which imported a hard numerical limit into the claims from only one spot in the prosecution history. But you can't quibble with the process, right? I mean, the manner in which the trial judge went about construing the claim. I mean, there's clear sensitivity that you're not supposed to import a limitation, and there's clear sensitivity to saying, look, I can't just sort of do this wild and woolly. I'm marching through the sort of Phillips phalanx, and I finally get to the point where I find this file history on the 610 patent, and I see a disclaimer saying, at least with an end product, substantially pure means north of 95% in order to get around a prior reference, right? So assume for purposes of argument, where Judge Proulx started, that we agree that the trial judge made no error in at least the data point of establishing that for an end product in this field, substantially pure is north of 95%. Once that happens, then don't you have a problem? No, because the term to be construed here, with all respect, no. Because the term is substantially pure regio isomer defined in this claim, in this patent, as an intermediate. Right, but the patent specification in numerous places refers to a substantially pure end product. Yes, and that's a different invention claimed in a different patent with a different prosecution history in which claim scope was disavowed specifically. It was not disavowed in this case, and the district court erred in taking the 95% number from an amendment in the prosecution of the patent in suit and inserting it into the claim. And that was legal error, and it shouldn't be sent back. But at least we're talking about, in that other prosecution, the word purity. And at least getting some idea of what they meant by purity. And they were talking about 95%. Yes, actually in the 610 patent, your honor, they were talking about 98% pharmaceutical-grade purity for hexafenidine, the end product. Because that's what's required under FDA law for an end product. There is no such requirement for a chemical intermediate that is only used inside of a chemical plant. That concept of it has to be pure enough to put into humans is completely absent, and one skill in the art would know that. I apologize. Thank you, Mr. Prokop. Mr. Lee, you know the dangers of trying to split time. We're not going to tell you when to stop and him when to start. So you're going to have to sit down when you want your partner to start. And that would be appropriate, your honor? Yes. Only the issue that I'm going to be addressed has been addressed to me, or I'll argue. No, OK. In that case, it sounds like you're going to have all the time. Go ahead. I would be more than happy to cede some time. Go ahead. You may proceed. It may please the court. I only have a few comments, and then we'll be available to answer questions from the court. As an initial matter, Mr. Berghoff pointed out that the Gutman case and its line of cases, including Bell and Howell, explained that this error, this type of error, is one that the court will reverse on a preliminary injunction. And with respect, the error in Gutman and in Bell and Howell were, at district court, ignoring an express definition, a specification. Still legal error, as alleged, but it's qualitatively a different type of error. That's an initial point. Move on from there. On the claim construction issue per se, at the nub of the issue, what Aventis is asking is for this court to forgive its choice of using the same descriptive term, to describe the purity of end products and the purity of intermediates. But there's no necessity that the two purity levels be the same, is there? Absolutely. They could have clarified in the specification. Absolutely meaning what?  There's no necessity. You're correct. You're correct, Your Honor. They could have specified that the intermediate has a certain purity limit, certain purity standard, and the end product has a different. Why didn't they specify? Because one of skill and the art is certainly going to know the difference. They're going to know that an intermediate is not a final product. In this case. And that's axiomatic. No, no, no. In this case, the fact. The purity of one is not going to be the purity of the other, is it? In the abstract, the purity of intermediate does not have to match the purity of the final product, and I believe that was the question. In this case, the point that's repeatedly made in the specification that's confirmed by the testimony of the inventor is that there was no mechanism, no known method to increase purity or separate after the intermediate stage. So logically, from the description in the specification, and particularly that's at appendix 334, column 4, in the background of the invention, it was made clear that there's no practical separation once you have the intermediate. So the level of impurities between the two regioisomers must remain constant in subsequent steps. So the logic of using the same descriptive phrase as to purity is compelling. It fits with their decision, which was a clear decision. Another point that has to be addressed is that Mr. Berghoff continually repeats here, as he did at the district court, that the phrase substantially pure regioisomer is only used in the claim and only used to describe an intermediate. I must point the court to column 4, line 18 and 19. A practical separation to obtain grand quantities of substantially pure regioisomers has not been achieved. The reference there to the second and third mixtures are to fexophenidone and fexophenidine. Those are the final products. And there, the precise phrase, granted it's in the plural, is substantially pure regioisomers. They're properly described as regioisomers. In the claim, the regioisomers are described as an intermediate. But here, it's a final product. But where does that get us? I mean, if the claim language is talking about intermediates, then why, I mean, and you can see that. You're not arguing that the claim language also covers end products. Absolutely not. So why is this relevant? The argument is that the court was correct on the facts and based on the, what he calls an assumption, that a single term will have a single meaning, is that substantial purity, substantially pure regioisomers, is used to describe the end product in the specification. But you're not suggesting that the use of that term in the claim language is used to describe. But substantial purity as modifying regioisomers and as modifying Pipperdine derivatives, and that's throughout the specification, for example, column 6, line 21, substantially pure Pipperdine derivatives are clearly the end products. The only question before the district court, and the only question here, is what does substantially pure mean? And then you look and you say there's a single definition of substantially pure. Substantially pure Pipperdine derivatives, that's the level of purity for final products. Substantially pure regioisomers, that's the level of, as to the claims, level of purity for the intermediate. Now when I was speaking with Mr. Burghoff, I said give me your best record evidence that substantially pure has the meaning he attributed to it. He spoke of Sir Baldwin and his expert testimony. Did your expert rebut that? Yes, indeed. The expert testimony is at A5493, pointing out not only that every example in the patent has a substantially pure intermediate, but that in the context of this patent, one would understand substantial purity has a single meaning. Dr. Schuster, I apologize. Was that expert testifying on claim construction or testifying on science? As I understood, Mr. Burghoff was to present Mr. Baldwin from Oxford University, who said substantially pure means largely but not wholly. He testified, to be fair, he testified that it might mean largely but not wholly, and more importantly, that it might have two meanings. When Judge Rader asked me what my best evidence is, I would start and stop, frankly, with the intrinsic evidence. You would go to the parent application of the 703, not the 610, which is a sibling, still relevant in the prosecution history, but the 703, a parent to the 703 patent issue, indicated that substantial purity was 95%. The court could have gone farther and went into the 610 prosecution history, as a textbook example applying Phillips, went through the entire prosecution history, recognized that there were more stringent purity requirements, but recognized he didn't have to go any farther to decide the preliminary injunction motion on the evidence presented today. So the intrinsic evidence, which is where claim construction should start and stop. I didn't think there was any real intrinsic evidence here. Absolutely. It just says directly what we're supposed to do with this. What there is, and I would point the court to not only the 703 prosecution history at A4568, but also in the 610 prosecution history, one of the cores of Aventis' claim construction position is that it's not permissible to separate substantially pure from the term it modifies, but throughout the 610 prosecution history, particularly at A4260, 4269, 4276, 4281, in every instance in their submissions in the 610 sibling application, they define quote substantially pure. And in some of the claims that were issued in that case, intermediates were at issue. With respect to some of the prior art, which was at stake, which was at issue in that appeal, or in that prosecution, a metabolite or intermediate based on the synthesis, intermediates were at issue. And they repeatedly used substantially pure set aside from what it was modified. Why did they do that? Because in the 610, substantially pure is used to modify both regio isomers and end products. The logic is unassailable given the assumption, but buttressed with the statements in the 703 patent that separation is not possible after the intermediate stage. One would have to assume that the purity level at the intermediate stage would be retained at the final product. So it's a logical decision, and of course the same phrases are used. As to the point of the same phrases being used, reference of course to the Black-Sylvie-Ranbaxy case, in which the applicant laid out different levels and different degrees of purity, in that case in an independent and dependent claim, and made it perfectly clear that while no numerical limits were spelled out, that there were different degrees and different grades of purity. As patent drafters, we use words to build our claims, and that's an important decision. And if you're going to continually use the phrase substantially pure, and not use the myriad of other words that you might use to describe purity, you should be held to that decision. Well, except when you realize you're speaking to one of skill in the art, and you can assume that they're going to know the distinctions, and they didn't define substantially pure regio isomer at any point in the specification we have before us. They defined it in the prosecution history, but you're correct, Your Honor, they didn't define it. But they did link the purity of the intermediate. They defined it? They defined the term substantially pure regio isomer? They expressly defined substantially pure in the context of the 610. Not regio isomer. No one is debating what a regio isomer is in this case. They did it in the context of an end product. Yes, in other words, your only definition is the end product, and we've already discussed, one of skill in the art would know there's a distinction. No, based on Professor Schuster's testimony, and of course... That gets us back to Sir Baldwin's testimony, which is a little bit different. Yes. So there is a relevance there, isn't it? You're ultimately building on that distinction. The distinction between... What one of skill in the art would understand the difference between a regio isomer and an end product to be. Sir Baldwin says one thing, Schuster says something else. Frankly, what Mr. Baldwin says is they might be different. And seeing the same words, one of skill in the art is not oblivious to the use of the English language. But your trump card, oh, this mind's all in the intrinsic evidence, really kind of breaks down here a little bit. Clearly it's in the intrinsic evidence. Well, clearly what is in the intrinsic evidence is the end product. What we have is the intermediate. Now, we just went through the logic here, we've got to get back to the point. What would one of skill in the art understand that distinction to be? One of skill in the art would place reliance on the use of the same phrase. Why would they? First, because of the logic of the 703 patent, that between the intermediate stage and the final stage, no practical separation is possible. And that particular context is significant to you. If there had been no disclosure in column four that you couldn't purify after the intermediate goes in, your case would be substantially weaker, would it not? The case would rest, as the district court's analysis would rest, on the so-called assumption that the same words in the specification mean the same thing. Aventis makes much of it that. Well, you'd have that on one side of the scale and you'd have what one of ordinary skill in the art testifying from Oxford said on the other side. So one is intrinsic and one is extrinsic. It would seem to me that the heart of your case, you hang on this disclosure in column four of this very embedder saying, once I throw the intermediate in, game's over for purification. That would be part of it. Obviously, the 610 prosecution history, which links the phrase substantial purity with the purity of the regio isomer in that order, substantially pure regio isomer, is used in the claims at issue in the 610. Right, but ordinarily, one would probably understand ordinarily you can have a 50% pure intermediate. That's correct. A series of 50% ingredients. That's correct. And you can do double, double toil and trouble in the urn and throw some stuff in and you can bring out a 99.9% pure improv. And again, I would turn to the beginning of my argument, which would be what they're asking for is forgiveness. That they used a term that they need not have used or shouldn't have used. Substantial purity is substantial purity. It's been clearly defined and explained in the specification. Now, do they have to use it? Obviously, the logic of column 4, it's there. The logic compels the purity level of the intermediate to be akin to the purity level of the final product. And that's why the error, if there was any error made by the district court here, is certainly not akin to the error. At some level, you're not dealing with an expert step. If the court has any questions. Thank you, Mr. Lee. Mr. Bergo, you have a couple of minutes remaining. I'd just like to come back to column 4 and address some misimpressions that may still be in the air here. Column 4 is referring to the prior heart process. And it does use the term regioisomers in its chemically correct sense that all of these compounds along the synthetic path have regioisomers. That's the prior heart. When we turn to the rest of the specification, the inventor was meticulous in only using the word regioisomer, substantially pure regioisomer, to refer to the intermediate. And meticulous in referring to the end products as PIPRD derivatives. Very clear intent by the applicant that when he's referring, in claim 7, substantially pure regioisomer, it's the intermediate. And, of course, it is. That's what it's referring to. Secondly, much of the argument by Apolyse hinges on this idea that the regioisomers are inseparable. And what column 4 actually is referring to, a quote, is that in the prior heart, they have been unable to obtain a practical separation of gram quantities. And that's column 4 in the first paragraph. So doesn't that mean the purity level at the regioisomer level is going to be the same as the end product? No, no. What this is referring to is that in the prior heart process, because you start in the prior heart process with a different intermediate, a different intermediate, not the cyclointermediate of the claims, you have a separation problem in practice. It's difficult to get gram quantities. We claim use of a unique starting material. That's what the amendment in the prosecution history was talking about. And it's that unique starting material that allows us to more easily get our preferred embodiment. So you can alter the purity level in your particular starting. Where do you say that in the specification? I don't believe we do have a statement of that, but it's implied from the fact that you don't get practical separation in the prior heart, but do in our process. And that was the argument made in the amendment relied on by the district court, where he took the 95% number and extruded the course. Thank you, Your Honor. Thank you, Mr. Perkoff. Thank you, Your Honor.